IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FOR SMITH DIVISION

JEPHTE AGUILAR                    .                                        PLAINTIFF


V.                              Civil No. 2:19-cv-02044-PKH-MEF


ANDREW M. SAUL[1],, Commissioner,
Social Security Administration                                           DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Jephte Aguilar, brings this action under 42 U.S.C. § 405(g), seeking judicial

review of a decision of the Commissioner of Social Security Administration ("Commissioner")

denying his claims for a period of disability and disability insurance benefits ("DIB") under Title

II of the Social Security Act (hereinafter "the Act"), 42 U.S.C. § 423(d)(1)(A). In this judicial

review, the court must determine whether there is substantial evidence in the administrative record

to support the Commissioner's decision.  *See* 42 U.S.C. § 405(g).

## I.        Procedural Background

Plaintiff filed his application for DIB on October 4, 2011, alleging an amended onset date

of July 3, 2011,[2] due to a hemorrhagic pituitary tumor; chronic headaches/migraines; neck, wrist,

and low back pain/sprain; plantar fasciitis; low testosterone; and, mood swings.  (ECF No. 12, pp.

140-146, 167, 183-184, 203).  After holding an administrative hearing on September 5, 2012 (*Id.*

at 61-88, 702-734, 788-815), the Administrative Law Judge ("ALJ") entered an unfavorable

decision on April 26, 2013, finding Plaintiff capable of performing a full range of light work.  (*Id.*

---

[1] On June 4, 2019, the Senate confirmed Andrew M. Saul as the Commissioner of the Social Security
Administration, replacing acting Commissioner, Nancy A. Berryhill.
[2] Plaintiff originally alleged on onset date of September 7, 2009.  (ECF No. 12, p. 65).  However, he later amended
his onset date to July 3, 2011.

at 15-22, 755-762).  On February 11, 2016, this Court remanded that decision to allow the ALJ to reconsider the severity of Plaintiff's plantar fasciitis and to request additional treatment records from Plaintiff's treating podiatrist, Dr. Mark Dotson.  (*Id*. at 773-775).

On December 6, 2018, the ALJ held a supplemental hearing.  (*Id*. at 680-701).  Plaintiff was present and represented by counsel.  The record reveals Plaintiff has a Bachelor of Science Degree in Botany and past relevant work experience as a machine operator.  (*Id*. at 175, 252).

On January 24, 2019, the ALJ found Plaintiff's headaches, pituitary adenoma, bilateral heel pain, and disorder of the back to be severe impairments.  (*Id*. at 660).  He concluded Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id*. at 661-662).  As such, the ALJ found Plaintiff capable of performing a full range of sedentary work.  (*Id*. at 662). Utilizing Medical-Vocational Rule 201.28, the ALJ determined Plaintiff could perform jobs that exist in significant numbers in the national economy.  (*Id*. at 673).

Both parties have now filed appeal briefs (ECF Nos. 15, 16), and this matter is ready for Report and Recommendation.

## II.    Applicable Law

This Court's role is to determine whether substantial evidence supports the Commissioner's findings.  *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010).  Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's decision.  *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011).  We must affirm the ALJ's decision if the record contains substantial evidence to support it.  *Blackburn v. Colvin,* 761 F.3d 853, 858 (8th Cir. 2014).  As long as there is substantial evidence in the record to support the Commissioner's decision, the court may not reverse it simply because substantial

evidence exists in the record to support a contrary outcome, or because the court would decide the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id*.

A claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. § 423(d)(1)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. § 404.1520(a)(4). Only if he reaches the final stage does the fact finder consider the Plaintiff's age, education, and work experience in light of his residual functional capacity ("RFC"). *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982), *abrogated on other grounds by Higgins v. Apfel*, 222 F.3d 504, 505 (8th Cir. 2000); 20 C.F.R. § 404.1520(a)(4)(v).

### III.    Discussion

Plaintiff raises the following issues on appeal: (1) whether the ALJ properly concluded that his headaches improved with medication, and (2) whether the ALJ properly evaluated Dr. Walz's consultative exam.

### A. Relevant Period

Before analyzing the issues raised in this case, it is important to note that the relevant period is limited.  Plaintiff filed an application for DIB and was only insured for DIB until December 31, 2014.  (ECF No. 12, p. 660).  A claimant must show that he became disabled during the period in which he met the DIB requirements in order to be entitled to benefits.  *Simmons v. Massanari*, 264 F.3d 751, 755 (8th Cir. 2001).  A claimant who becomes disabled after the expiration of his insured status is not entitled to DIB.  *Pyland v. Apfel*, 149 F.3d 873, 876 (8th Cir. 1998).  Thus, the relevant period in this case is from July 3, 2011, Plaintiff's alleged onset date, through March 31, 2014, his date last insured.

### B.    RFC Determination

Plaintiff first argues that the ALJ improperly concluded his headaches improved with medication.  He insists the RFC does not include the extra work breaks and work absences these headaches would impose.

RFC is the most a most a person can do despite that person's limitations. 20 C.F.R. § 404.1545.  "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations."  *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010); *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009).  Limitations resulting from symptoms such as pain are also factored into the assessment.  20 C.F.R. § 404.1545(a)(3).  The United States Court

of Appeals for the Eighth Circuit has held that a claimant's RFC is a medical question and must be supported by medical evidence that addresses the claimant's ability to function in the workplace. *Miller*, 784 F.3d at 479 (citing *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001)); *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012). However, there is no requirement that an RFC finding be supported by a specific medical opinion. *Hensley v. Colvin*, 829 F.3d 926, 931-32 (8th Cir. 2016); *Myers v. Colvin*, 721 F.3d 521, 526-27 (8th Cir. 2013) (affirming RFC without medical opinion evidence); *Perks*, 687 F.3d at 1092-93 (same).

Contrary to Plaintiff's contention, the medical evidence dated during the relevant period shows his headaches were amenable to treatment and supports the ALJ's finding he could perform sedentary work. In June 2011, Plaintiff was involved in a motor vehicle accident resulting in back and neck pain. On August 10, he established care with Dr. Sean Baker for complaints of neck pain but made no mention of headaches. (ECF No. 12, pp. 264-279, 318-322, 538-542). Plaintiff reported that chiropractic treatment was helpful. An examination revealed some mid-back spasms and tenderness and a normal mental status exam. Two weeks later, Plaintiff reported persistent neck pain, but again did not mention headaches. (*Id*. at 280-295, 318-319, 543-544).

On September 6, 2011, Plaintiff participated in physical therapy for his cervical and lumbar pain. (*Id*. at 259-262). He admitted the reason he was not working was because he had a new baby at home.

On September 16, 2011, an MRI of Plaintiff's brain showed a well-defined mass measuring up to 1.1 centimeters in the sella, displacing the pituitary stalk. (*Id*. at 296-304, 563). Dr. Baker referred him to endocrinologist, Paul Howell, Jr., for an evaluation of the pituitary mass and low testosterone. (*Id*. at 316-317, 547-549). At this time, he reported no headaches and his mental status findings remained unremarkable.

On October 3, 2011, an MRI of Plaintiff's pituitary gland confirmed the right sided pituitary lesion, likely an area of previous pituitary hemorrhage that displaced the pituitary stalk to the left and extended superiorly to abut the optic chiasm. (*Id*. at 305-306, 342, 550, 563-564). This suggested the possibility of an underlying hemorrhagic lesion resulting from Plaintiff's motor vehicle accident.

On October 4, 2011, Plaintiff consulted with endocrinologist, Paul Howell, Jr. (*Id*. at 329-332, 334-340, 571). Noting elevated prolactin levels, Dr. Howell concluded he was likely suffering from a prolactin-secreting tumor that could be treated with medication. Plaintiff first voiced complaints of headaches and blurred vision at this time. Dr. Howell documented normal clinical examination findings. He prescribed Dostinex (Cabergoline) to lower Plaintiffs prolactin level.

At Dr. Howell's behest, Plaintiff saw ophthalmologist, Matthew Renner, to evaluate his complaints of blurred vision and headaches. (*Id*. at 33). Dr. Howell was concerned that his vision problems could be causing his headaches. Plaintiff told Dr. Renner that his peripheral vision also seemed to have decreased. Following a thorough exam, Dr. Renner determined Plaintiff had 20/20 corrected vision in both eyes and both eyes were reactive to light without evidence of an afferent pupillary defect. Visual field testing and an anterior and posterior segment examination revealed no pathology in either eye. Although Dr. Renner concluded Plaintiff had no vision loss, he offered Plaintiff a glasses prescription to correct a mild astigmatic refractive error, but Plaintiff refused.

On November 15, 2011, Plaintiff reported to Dr. Baker that he had begun Dostinex but continued to experience headaches and blurry vision. (*Id*. at 307-315, 551-553). His physical exam remained essentially normal. Dr. Baker diagnosed migraine headaches, pituitary adenoma, malaise, and fatigue and prescribed Trezix to be taken as needed for the headaches.

On January 5, 2012, agency consultant, Dr. Alice Davidson, reviewed Plaintiff's medical records and concluded he could perform a full range of light work. (*Id*. at 433-440).

On January 18, 2012, a repeat MRI of Plaintiff's brain showed a slight decrease in the size of the pituitary tumor and chronic sinusitis in the sphenoid and maxillary sinuses. (*Id*. at 600).

Between January and May 2012, Plaintiff received chiropractic treatment and was treated by podiatrist, Mark Dotson, for continued complaints of neck, back, and foot pain. (*Id*. at 464, 468, 470-501, 528). He was prescribed custom orthotics and non-steroidal anti-inflammatories.

On February 29, 2012, Dr. Jonathan Norcross reviewed Plaintiff's medical records and affirmed Dr. Davidson's assessment of light work. (*Id*. at 444).

In March 2012, Dr. Howell noted some improvement in Plaintiff's overall condition. (*Id*. at 578, 596-598). His labs confirmed the MRI suggestion that his pituitary tumor was resolving. And, Plaintiff reported his headaches were somewhat improved.

On May 1, 2012, otolaryngologist, Michael Gwartney, evaluated Plaintiff for possible chronic sinusitis. (*Id*. at 576, 599). He denied a history of sinus/allergy complaints or sinus issues. On exam, Dr. Gwartney noted some thickening of the mucosa of the sphenoid sinus and some scattered throughout the ethmoid but found nothing remarkable. He diagnosed allergic rhinitis and prescribed Nasonex.

On May 7, 2012, Plaintiff advised Dr. Baker that his daily headaches were relieved with medication. (*Id*. at 554-555, 602-605). He also complained of mid-abdominal pain after lifting rocks in his garden. Dr. Baker cautioned him regarding lifting and pulling objects and referred him to Dr. Stephen Seffense for an evaluation of an inguinal hernia.

On May 21, 2012, Dr. Seffense documented a normal physical exam.  (*Id*. at 573-575).  He stated Plaintiff should continue to rest from extensive lifting and imposed a 10 to 15-pound lifting limitation for "the next couple of weeks."

On June 5, 2012, Plaintiff reported to Dr. Baker that he continued to have some visual changes with his headaches.  (*Id*. at 556-558).  However, he indicated the headaches were "no worse."  Dr. Baker documented a normal clinical exam with a normal mood and affect.  He opined that Plaintiff's pituitary hemorrhage could be caused by trauma but could not confirm this as some people develop them spontaneously for other reasons.

On June 26, 2012, an MRI of Plaintiff's brain revealed no acute intercranial abnormality, representing resolution of the previously suspected pituitary hemorrhage.  (*Id*. at 561, 567, 599).

On July 3, 2012, neurologist, Anthony Capocelli, evaluated Plaintiff for neck pain, headaches, and generalized fatigue.  (*Id*. at 534-536, 606-608).  It appears Plaintiff had been involved in another motor vehicle accident and, as a result, was experiencing a headache.  Dr. Capocelli noted the June MRI showing complete resolution of the pituitary lesion with medication. He concluded Plaintiff's headaches were also gradually improving, as he reported that Acetaminophen and resting in a dark room provided some relief.  *Renstrom v. Astrue*, 680 F.3d 1057, 1066 (8th Cir. 2012) (holding an impairment that can be controlled by treatment or medication cannot be considered disabling).  On exam, Dr. Capocelli documented a normal clinical exam, except for a slight decrease in the range of motion in Plaintiff's neck.  Further, he determined no surgical intervention was required and concluded Plaintiff should continue with his current treatment regimen.

On August 2, 2012, Plaintiff indicated his headaches were unchanged in severity, seeming to come and go rather quickly.  (ECF No. 12, pp. 559-560).  Dr. Baker noted they intensified with

8

his back and neck pain.  Plaintiff again reported that Tylenol seemed to help his migraine-type headaches.  Dr. Baker prescribed Soma and Naproxen.

On August 8, 2012, Dr. Howell observed that Plaintiff's MRI scan showed resolution of the tumor and his lab values confirmed a decrease in his prolactin level.  (*Id*. at 569-571, 593-595).  Dr. Howell opined that chronic sinusitis likely caused his headaches.  The same month, Dr. Baker documented normal clinical examination findings.  Although Plaintiff complained that he continued to have headaches, he reported Tylenol "seems to help."

During the month of August, Plaintiff also received another round of chiropractic treatment for his back and neck pain.  (*Id*. at 615-642).

On December 20, 2012, Dr. Howell composed a letter to Plaintiff's attorney detailing Plaintiff's treatment.  (*Id*. at 653-654).  He indicated that Plaintiff's hemorrhagic pituitary tumor and high prolactin levels had completely resolved after being placed on Cabergoline.  Dr. Howell opined Plaintiff's issue was most likely a hemorrhage.  While the cause of the hemorrhage could not be definitively ascertained, as it would take a significant traumatic injury to cause a hemorrhage, Dr. Howell stated that a motor vehicle accident would be a likely explanation for it.  He also indicated that Plaintiff's prolactin level had returned to normal without the need for continued medication.

On February 14, 2014, Plaintiff reported nocturnal headaches.  (*Id*. at 866-878).  He was no longer taking the Cabergoline as per Dr. Howell but had also not followed-up with him for financial reasons.  Dr. Baker documented normal clinical exam findings, including a normal mood and affect.  He recommended a repeat MRI and adjusted Plaintiff's Amitriptyline dosage.

On March 7, 2014, an MRI of Plaintiff's brain showed a probable tiny pituitary adenoma/microadenoma at the right superior aspect of the pituitary gland just to the right of the

pituitary stalk measuring approximately 3mm in size, unchanged from the June 26, 2012 scan, and a chronic mucous retention cyst in the inferior sphenoid sinus. (*Id*. at 890).

On February 2015, Advanced Practical Nurse, Patsy Ann Clark, prescribed Fioricet to treat Plaintiff's reportedly increased headaches. (*Id*. at 1103-1105, 1119-1124). Again, a normal clinical exam was noted.

Accordingly, the record makes clear that Plaintiff's headaches were likely related to his pituitary tumor/hemorrhage. And, contrary to Plaintiff's contention, the evidence shows the tumor/hemorrhage had resolved by June 2012. The evidence also shows that his headaches responded to both medication and rest. *See Renstrom*, 680 F.3d at 1066. Further, there is nothing in the record to suggest that additional work breaks or absences would necessarily flow from the fact that he suffered from these headaches.

Plaintiff relies on his subjective reports of pain and activities of daily living (ADLs) to support his contention that his headaches resulted in additional work-related limitations. The ALJ, however, considered Plaintiff's ADLs, including the fact he could care for his personal hygiene, exercise, attend church, drive himself to appointments and take his children to school, help care for his infant, lift rocks in his garden, manage his personal finances, and work part-time as a Google ad rater after his alleged onset date. (ECF No. 12, pp. 185-187, 192, 644-645, 682-683). *See Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) (holding claimant's ability to drive, shop, visit friends and relatives was consistent with sedentary work). However, these activities support the ALJ's finding that Plaintiff could perform sedentary work.

Further, aside from Plaintiff's subjective assertions, the record contains no evidence to suggest he was incapable of shopping, cooking and cleaning for himself during the relevant time. (*Id*. at 186). The ALJ did consider the third-party statements submitted by Plaintiff's in-laws

indicating that they babysat, performed household chores, grocery shopped, ran errands, and performed yard work for the Plaintiff. (*Id*. at 233, 234). The ALJ, however, properly assigned the same weight to their statements as he assigned to Plaintiff's statements, finding that the objective evidence did not support his allegations of disabling limitations. (*Id*. at 672). Lay testimony may properly be rejected if it is contrary to the objective medical evidence, especially if the witness has an interest in the outcome of the case, such as is the case here. *See Choate v. Barnhart*, 457 F.3d 865, 872 (8th Cir. 2006) (holding testimony of wife was properly discredited when similar to claimant's and added little information); *Black v. Apfel*, 143 F.3d 383, 387 (8th Cir. 1998) (same evidence that discredited claimant discredited her parents); *Ostronski v. Chater*, 94 F.3d 413, 418 (8th Cir. 1996) (holding witness testimony of mother, sister, and husband properly discredited because not qualified to render opinion about claimant's ability to work and testimony conflicted with medical evidence); *Siemers v. Shalala*, 47 F.3d 299, 302 (8th Cir. 1995) (wife's testimony properly discredited where based upon claimant's own subjective complaints).

It is also significant to note that Plaintiff admitted he stopped working, not because his headaches rendered him unable to work, but because his wife was sick and pregnant. (ECF No. 12, pp. 644). Therefore, the ALJ properly considered the fact that Plaintiff stopped working for reasons other than his allegedly disabling headaches. *See Medhaug v. Astrue*, 578 F.3d 805, 816-17 (8th Cir. 2009) (holding ALJ properly considered fact claimant was laid off from work as a laborer rather than quit working due to an impairment).

Plaintiff also contends that the ALJ's reliance on medical records wherein he failed to mention headaches is an insufficient reason to discount his allegations of disabling headaches. We disagree. Plaintiff's failure to complain of headaches while seeking treatment for pain in other areas suggests that his headaches were not a concern at that time. Accordingly, it was proper for

the ALJ to infer that the Plaintiff's headaches were controlled, or at the very least tolerable with the medication prescribed. Otherwise, he would have voiced complaints and consistently requested medication changes or adjustments.

Although it does appear that Plaintiff's headaches may have worsened in 2016 and 2017, this evidence is outside the relevant period and does not relate back to Plaintiff's condition during the relevant period. Therefore, while it might be grounds for Plaintiff to file an application for Supplemental Security Income, if he meets the filing requirements, it does not require reversal of the Commissioner's decision in the present case.

Accordingly, the undersigned finds substantial evidence to support the ALJ's conclusion that Plaintiff's headaches did not limit him beyond sedentary work during the relevant period.

### B.    Medical Opinion Evidence

Plaintiff also insists the ALJ did not properly consider the consultative examination of psychologist, Patricia Walz, and failed to provide legitimate reasons for discounting her findings. However, the results of a one-time medical evaluation generally do not constitute substantial evidence upon which the ALJ may base his opinion. *Cox v. Barnhart*, 345 F.3d 606, 610 (8th Cir. 2003). An ALJ may also consider the fact that a doctor's statement is conclusory and inconsistent with the medical evidence of record. *See Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003) (a conclusory statement not supported by medical diagnoses based on objective evidence will not support a finding of disability); *see also Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002) (an ALJ may reject the opinion of any medical expert where it is inconsistent with the medical record as a whole).

In October 2012, Dr. Walz examined Plaintiff at the Commissioner's request. (*Id*. at 643-657). Plaintiff denied a history of mental health treatment, reporting that he took Amitriptyline to

help him sleep.  IQ testing revealed a full-scale IQ of 91, placing him in the average range of intellect, but there was a significant difference between his verbal comprehension and perceptual reasoning scores.  Dr. Walz also noted he worked very slowly, and his processing speed score was in the borderline range.  Thus, she diagnosed cognitive disorder secondary to encephalopathy (pituitary mass) and depression secondary to a medical condition.

Dr. Walz also completed an RFC assessment.  (*Id*. at 648-651).  She assessed marked limitations in the following areas: ability to make judgment on simple work-related decisions; understand, remember, and carry out complex instructions; make judgment on complex work-related decisions; and, respond appropriately to usual work situations and to changes in a routine work setting due to cognitive dysfunction secondary to encephalopathy.  Dr. Walz also indicated Plaintiff had moderate limitations understanding, remembering, and carrying out simple instructions.  She concluded Plaintiff had easy irritability, cognitive impairment with memory deficits, and impaired executive functioning and processing speed.

The ALJ gave partial weight to Dr. Walz's assessment of cognitive disorder secondary to a pituitary tumor because later medical evidence indicates that the tumor resolved.  (*Id*. at 653-654).  As previously mentioned, Dr. Howell opined that Plaintiff's tumor, most likely hemorrhagic in nature, had completely resolved.  He also noted that, although Plaintiff's prolactin level was initially elevated, his level had returned to normal with medication.  And, by December 2012, he was no longer taking medication.

Aside from Dr. Walz's assessment, the record contains no other records to suggest that the Plaintiff was suffering from a cognitive impairment.  None of the treatment notes from Plaintiff's treating physicians make note of any difficulties in his ability to remember, learn new things, concentrate, or make decisions.  And, Plaintiff did not report any deficiencies in these areas to his

physicians.  In fact, Plaintiff admitted that he quit work, not due to his physical or mental inability to work, but because his wife was sick and pregnant.  Thus, the undersigned finds that the ALJ properly evaluated Dr. Walz's opinion and assigned it only partial weight.

## IV.    Conclusion

Based on the foregoing, I recommend affirming the ALJ's decision and dismissing the Plaintiff's Complaint with prejudice.

**The parties have fourteen (14) days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  We remind the parties that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 3rd day of March 2020.

/s/ Mark E. Ford
HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE

14